# SUPREME COURT OF THE UNITED STATES

_____

### No. 23–5244 (23A90)

_____

## JOHNNY JOHNSON _v._ DAVID VANDERGRIFF, WARDEN

### ON APPLICATION FOR STAY AND ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

#### [August 1, 2023]

The application for stay of execution of sentence of death presented to JUSTICE KAVANAUGH and by him referred to the Court is denied. The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting from the denial of application for stay and denial of certiorari.

Executing a prisoner who has lost his sanity has, for centuries, been branded inhuman. See _Ford_ v. _Wainwright_, 477 U. S. 399, 409 (1986) ("[T]he natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today"). The Eighth Amendment recognizes as much. Our Constitution therefore prohibits executing a prisoner who lacks capacity to form a rational understanding of the reason for his execution. To safeguard this constitutional guarantee, once a prisoner makes a substantial threshold showing of insanity, courts must provide a fair hearing to determine a prisoner's competency to be executed. See _Panetti_ v. _Quarterman_, 551 U. S. 930 (2007).

Johnny A. Johnson has a decades-long documented history of severe mental illness, including schizophrenia. Johnson alleges that he is incompetent to be executed, and

requested a hearing to evaluate his competence before Missouri executes him. This request came after a psychiatrist found him incompetent because "he does not have a rational understanding of the link between his crime and his punishment." App. to Pet. for Cert. 53a. In fact, Johnson believes that "Satan [is] 'using' the State of Missouri to execute him in order to bring about the end of the world." *Id.,* at 54a.

The Supreme Court of Missouri, over a noted dissent, denied Johnson a competency hearing because it concluded that he had not made a substantial threshold showing of insanity. That was error. A federal District Court then denied Johnson habeas relief. A panel of the Eighth Circuit stayed his execution and issued a certificate of appealability (COA), which would have permitted his competency claim to be fully briefed and argued on the merits. But the en banc Eighth Circuit, over a dissent from three judges, vacated that stay and declined to issue a COA because it concluded that no reasonable jurist could disagree with the District Court. That too was error. Because reasonable jurists could, did, and still debate whether the District Court should have granted habeas relief, the Eighth Circuit should have authorized an appeal. I would grant the petition for a writ of certiorari, summarily vacate the order of the Eighth Circuit denying a COA, and grant Johnson's request for a stay of execution pending appeal.

I

Counsel for Johnson filed a habeas petition in the Supreme Court of Missouri arguing that his execution would violate the Eighth and Fourteenth Amendments because he is incompetent to be executed. The petition sought a stay of Johnson's execution and an evidentiary hearing on his competency claim.

In support of his petition, Johnson submitted a 55-page

report from a psychiatrist, Dr. Bhushan Agharkar, who re-
viewed his medical records and conducted an over two hour
in-person evaluation before finding him incompetent to be
executed. Dr. Agharkar concluded that "Johnson is aware
he is on death row and that he was convicted of murder.
However, he does not have a rational understanding of the
link between his crime and his punishment. His under-
standing of the reason for his execution is irrational and
delusional, because he believes it is Satan 'using' the State
of Missouri to execute him in order to bring about the end
of the world and that the voice of Satan confirmed this plan
to him. He believes he has been marked with the 'Seventh
Sign' and the world will be destroyed were he to die." *Id.,*
at 53a–54a.

Johnson also submitted medical records detailing his dec-
ades-long history of psychotic mental illness, including
schizophrenia and delusions. He previously experienced
visual and auditory hallucinations that told him to kill him-
self and hurt others, and reported seeing "demons" and
hearing the voice of "Leviathan." At one point, he heard
voices telling him to cut his own arm off and he cut himself
repeatedly with a razor; in another incident, he wrote "we're
dead" and "die" on the wall with his own feces and blood.
Over the years, Johnson has also expressed delusions about
his death, including repeatedly observing that the world
will end when he dies. See, *e.g., id.,* at 63a ("I think I'm the
7th sign. I'm the end of the world when I die"); *id.,* at 68a
("I think that the world will end if I die"); *id.,* at 74a (prison
psychologist reporting that Johnson "ha[d] heard God's
voice talking directly to him and sometimes he 'can hear the
other side of the world and different spirits'").

In response to this compelling evidence, Missouri submit-
ted only a one-and-a-half-page affidavit from Ashley
Skaggs, the institutional chief of mental health at John-
son's prison. Missouri does not dispute that Skaggs, a li-
censed professional counselor, is not qualified under state

law to make a formal determination of competence to be executed. Nor is there any dispute that Skaggs did not evaluate Johnson for the purpose of determining his competency for execution, but instead met with him for a few minutes sporadically during a three-year period to discuss his ongoing treatment. In response to Dr. Agharkar's report, Skaggs attested that Johnson "has never expressed these kinds of hallucinations or delusional beliefs. On the contrary, in recent months Mr. Johnson has reported that his auditory hallucinations are well managed by medication and has denied more severe symptoms or side effects. . . . From my observations, Mr. Johnson appears to understand the nature of his upcoming execution." *Id.,* at 58a–59a.

The Supreme Court of Missouri, over a dissent, concluded that Johnson was not entitled to an evidentiary hearing because he did not make a "'substantial threshold showing of insanity' required by *Panetti* and *Ford.*" 668 S. W. 3d 574, 576 (2023). Johnson challenged this denial in federal habeas proceedings. The District Court denied his petition on the merits, and Johnson moved the Eighth Circuit for a stay of execution and applied for a COA. An Eighth Circuit panel stayed the execution and granted the certificate limited to the claim that Johnson was incompetent to be executed. Missouri sought rehearing, and the en banc Eighth Circuit, over dissent from Chief Judge Smith, Judge Kelly, and Judge Erickson, granted the petition for rehearing, denied the application for a COA, and denied the motion for a stay of execution.

## II

A state prisoner whose habeas petition is denied by a district court can appeal only if a judge issues a COA. Issuing a COA requires that the prisoner make "a substantial showing of the denial of a constitutional right." 28 U. S. C. §2253(c)(2). To make that showing, the prisoner need only demonstrate that "reasonable jurists could debate whether

. . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack* v. *McDaniel*, 529 U. S. 473, 484 (2000) (internal quotation marks omitted).

The Eighth Circuit erred in denying a COA for two reasons.[1] To start, the Eighth Circuit was too demanding in assessing whether reasonable jurists could debate the merits of Johnson's habeas petition. The Missouri Supreme Court, with a dissent, denied Johnson's claim, a panel of the Eighth Circuit granted a stay of execution and a COA, and three judges dissented when the en banc court vacated the panel's order.[2] There was, of course, good reason for those judges to debate the merits of Johnson's habeas petition: It was objectively unreasonable for the Supreme Court of Missouri to conclude that Johnson did not establish even a threshold showing of incompetence. "Those facts alone might be thought to indicate that reasonable minds could differ—*had differed*—on the resolution of [Johnson's] claim." *Jordan* v. *Fisher*, 576 U. S. 1071, 1076 (2015) (SOTOMAYOR, J., dissenting from denial of certiorari).

The Eighth Circuit's second mistake was failing to "limit its examination to a threshold inquiry." *Miller-El* v. *Cockrell*, 537 U. S. 322, 327 (2003). The only issue before the court was the threshold jurisdictional question whether to issue a COA. When a court of appeals departs from the limited COA inquiry, without even full briefing or oral argument, and instead opines on the merits of an appeal, "'it

———————

[1] The en banc Eighth Circuit's rationale is found in Judge Gruender's concurrence, which is joined by all seven judges in the majority.

[2] As a general matter, courts of appeals will rehear a case en banc only when en banc consideration "is necessary to secure or maintain uniformity of the court's decisions" or "the proceeding involves a question of exceptional importance." Fed. Rule App. Proc. 35(a). It is more than unusual that an en banc Eighth Circuit concluded that a grant of a COA by a panel met this high standard.

is in essence deciding an appeal without jurisdiction.'" *Buck* v. *Davis*, 580 U. S. 100, 115 (2017) (quoting *Miller-El*, 537 U. S., at 336–337). The majority nevertheless extensively discussed the merits of Johnson's habeas claim, concluding that "[t]he Supreme Court of Missouri's decision was not 'contrary to' *Panetti*," "[n]or has Johnson made a substantial showing that the Supreme Court of Missouri's decision was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" App. to Pet. for Cert. 132a, 133a. These are merits determinations, and "a COA ruling is not the occasion for a ruling on the merit of [a] petitioner's claim." *Miller-El*, 537 U. S., at 331.

The COA requirement erects an important but not insurmountable barrier to an appeal. When a habeas petitioner makes a substantial showing that his constitutional rights were violated, a COA should issue. This is especially true in this context, where competency has to be determined at the time of execution, and that determination requires contemporaneous factual development. The only question before the Eighth Circuit was whether reasonable jurists could debate the District Court's disposition of Johnson's habeas petition. That question, in turn, depends on whether reasonable jurists could debate whether the Missouri Supreme Court contravened or unreasonably applied clearly established federal law. See 28 U. S. C. §2254(d). Here, reasonable jurists can and do have that debate.

III

Because Johnson made "'a substantial threshold showing of insanity,'" he is entitled to a "'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U. S., at 949 (quoting *Ford*, 447 U. S., at 426). The central question to determine competency is "whether a prisoner's concept of reality is so impair[ed] that he cannot grasp the execution's meaning

and purpose or the link between [his] crime and its punishment." *Madison* v. *Alabama*, 586 U. S. ___, ___ (2019) (slip op., at 3) (internal quotation marks omitted; alterations in original). At minimum, reasonable jurists could debate whether the Supreme Court of Missouri contravened or unreasonably applied clearly established federal law—namely, *Ford* and *Panetti*—in determining that Johnson did not make a threshold showing of incompetency. Here, the Supreme Court of Missouri made at least two errors.

First, the Supreme Court of Missouri confronted facts that were "materially indistinguishable" from *Panetti*, but "arrive[d] at a result opposite to ours." *Williams* v. *Taylor*, 529 U. S. 362, 405 (2000). In *Panetti*, this Court conducted an "independent review of the record" and concluded that the prisoner met the threshold showing of incompetence based on a letter from his doctor following an 85-minute examination as well as "extensive evidence of mental dysfunction considered in earlier legal proceedings." 551 U. S., at 950. The prisoner in *Panetti* suffered "mental problems . . . indicative of schizo-affective disorder, . . . resulting in a genuine delusion" that his execution was "'part of spiritual warfare . . . between the demons and the forces of the darkness and God and the angels and the forces of light.'" *Id.*, at 954 (internal quotation marks omitted). This Court noted that there was "much in the record to support the conclusion that [Panetti] suffers from severe delusions." *Id.*, at 956. *Panetti* is strikingly similar to this case. As Judge Kelly noted in dissent, "Johnson's evidence of incompetency [is] materially indistinguishable from the evidence deemed sufficient in *Panetti*." App. to Pet. for Cert. 137a. Johnson submitted a 55-page report from his doctor summarizing his "'long-documented history of psychotic mental illness'" and concluding that he was incompetent to be executed, as well as voluminous medical records detailing his decades-long history of mental illness. The record further reflects that, because of his "severe psychotic mental illness

and a cognitively impaired brain," Johnson believes that "Satan [is] 'using' the State of Missouri to execute him in order to bring about the end of the world." *Id.,* at 54a.

Second, the Supreme Court of Missouri unreasonably applied *Panetti*'s legal standard. *Panetti* focuses on whether a prisoner can reach a "rational understanding of the reason for [his] execution." 551 U. S., at 958. Despite reciting the correct standard, the Supreme Court of Missouri applied the wrong one. The court found the persuasiveness of Dr. Agharkar's 55-page report "significantly weakened by Skaggs' [one-and-a-half-page] report" and Johnson's medical records. 668 S. W. 3d, at 579, n. 7. The court relied in part on Skaggs' affidavit to discredit Dr. Agharkar's report even though Dr. Agharkar applied *Panetti*'s legal standard while Skaggs, unqualified to render an opinion on competency, only proffered that Johnson "appears to understand the nature of his upcoming execution." App. to Pet. for Cert. 59a. The Eighth Circuit highlighted Skaggs' opinion and concluded that "to understand the nature of an execution is to have a rational understanding of the reason for it." *Id.,* at 134a. That is plainly wrong. Understanding the nature of an execution is distinct from understanding rationally the reason for an execution. Even a "prisoner's awareness of the State's rationale for an execution," his acknowledgment that "he will be executed," and his understanding that "the reason the State has given for the execution is his commission of the crimes in question" does not resolve the inquiry into whether he has a "rational understanding of the reason for the execution." *Panetti*, 551 U. S., at 956–959. Here, for example, although Johnson understands he will be executed and die by lethal injection, his delusions lead him to believe that "Satan [is] 'using' the State of Missouri to execute him in order to bring about the end of the world," that "the underworld can influence the State to not execute him for Satan's purposes," and that "he is a vampire and able to 'reanimate' his organs" and "enter an animal's mind

if he can learn the right 'code' in order to go on living after his execution." App. to Pet. for Cert. 54a.

The Supreme Court of Missouri also discounted Dr. Agharkar's testimony based on evidence that was at best tangential to the *Panetti* inquiry. Specifically, the court emphasized Johnson's statements that he was "'very ashamed of killing his best friend's daughter'" and that he was "'working with his attorneys to fight his case as best as he can,'" as well as notes in his medical records stating that medications are controlling his auditory hallucinations. 668 S. W. 3d, at 578–579. None of this evidence provides meaningful insight into whether Johnson "grasp[s] the . . . 'meaning and purpose'" of his execution—much less calls into question Dr. Agharkar's conclusion about competency or Johnson's delusional belief that Satan is using the State of Missouri to execute him. *Madison*, 586 U. S., at \_\_\_ (slip op., at 3).

Put simply, it is beyond question that Johnson's habeas claim is "reasonably debatable." *Buck*, 580 U. S., at 117. Members of this Court, the Eighth Circuit, and the Supreme Court of Missouri have already done so. To nevertheless maintain that Johnson should be denied a COA because no reasonable jurist could debate the District Court's denial of his habeas petition defies common sense. Under well-established equitable principles, courts evaluating a stay must consider the applicant's likelihood of success on the merits and potential for irreparable injury, as well as other parties' injury and the public interest. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). For the reasons above, Johnson has established a substantial likelihood of success on the merits of his claim. The equities here, as in almost all death penalty cases where a prisoner has shown a reasonable probability of success on the merits, favor Johnson. See *Bucklew* v. *Precythe*, 587 U. S. \_\_\_, \_\_\_ (2019) (SOTOMAYOR, J., dissenting) (slip op., at \_\_\_). I would therefore grant the petition for a writ of certiorari, summarily

vacate the order of the Eighth Circuit denying a COA, and grant Johnson's request for a stay of execution pending appeal.

In sum, Johnson presented extensive threshold evidence of incompetency—including voluminous medical records documenting his decades-long struggle with mental illness and a 55-page report from his psychiatrist. That entitled him to a competency hearing under *Panetti*. Anything less denies Johnson a meaningful opportunity to be heard.

*        *        *

The Court today paves the way to execute a man with documented mental illness before any court meaningfully investigates his competency to be executed. There is no moral victory in executing someone who believes Satan is killing him to bring about the end of the world. Reasonable jurists have already disagreed on Johnson's entitlement to habeas relief. He deserves a hearing where a court can finally determine whether his execution violates the Eighth Amendment. Instead, this Court rushes to finality, bypassing fundamental procedural and substantive protections. I respectfully dissent.